UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEROY STEWART,

       Plaintiff,

v.                                     Case No.  8:07-cv-54-T-24 MAP

JORGE SOTOLONGO, ET AL.,

       Defendants.
_____/

**ORDER**

    This cause comes before the Court on two motions: (1) Defendants Sotolongo and

Yaslowitz's Motion to Dismiss or for Summary Judgment (Doc. No. 10), which Plaintiff

opposes (Doc. No. 18), and (2) Defendant City of St. Petersburg's Motion to Dismiss or for

Summary Judgment (Doc. No. 9), which Plaintiff opposes (Doc. No. 19).  Because the parties

have submitted evidence for the Court to consider in connection with these motions as they

relate to Counts I and II, the Court will treat them as motions for summary judgment instead of

motions to dismiss as to those counts.

**I.  Standard of Review**

    Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that the moving

party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears

the initial burden of showing the Court, by reference to materials on file, that there are no

genuine issues of material fact that should be decided at trial.  See Celotex Corp. v. Catrett, 477

U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by

"showing" or "pointing out" to the Court that there is an absence of evidence to support the non-

moving party's case.  Id. at 325.  Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim.  See id.  When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## II.  Background

Plaintiff, an African American man, is suing two police officers, Defendants Jorge Sotolongo and Jeffrey Yaslowitz, along with the City of St. Petersburg, Florida ("the City") in connection with a traffic stop.  At the time of the stop, Sotolongo was a lieutenant with the St. Petersburg Police Department and assigned as Commander of the Street Crimes Unit.

(Sotolongo aff.[1], ¶ 3).  As such, Sotolongo was the supervisor of Officer Yaslowitz, who was a member of the Street Crimes Unit.  (Sotolongo aff., ¶ 3; Yaslowitz aff.[2], ¶ 3).

On October 6, 2005, after leaving a nursing home where he was visiting his terminally ill mother, Plaintiff was approached by a man, Teico Atkins, who asked for a ride.  (Pla. aff.[3], ¶ 2). Plaintiff agreed to drive Atkins to a Wal-mart, and when Plaintiff stopped at a red light, several police cars surrounded Plaintiff's car.  (Pla. aff., ¶ 2, 4).

Unbeknownst to Plaintiff, Atkins had fled from an attempted police stop of his car, which Atkins had abandoned.  Also unbeknownst to Plaintiff, the police were searching for Atkins when they observed Atkins enter into Plaintiff's car.

The police officers removed Atkins from Plaintiff's car and handcuffed Atkins.  (Pla. aff., ¶ 4).  Thereafter, Officer Lisa Eron asked Plaintiff if he had anything illegal in his car, to which Plaintiff responded that he did not.  (Yaslowitz Police Report[4], p.2).  Eron then asked Plaintiff whether he had any weapons in the car, to which he responded that he did have a gun in the car and that he had a concealed weapons permit.  (Pla. aff., ¶ 5).  After Plaintiff informed Eron of the existence of the gun, Yaslowitz pulled Plaintiff out of the car and handcuffed Plaintiff's hands behind his back.  (Pla. aff., ¶ 5, 6; Yaslowitz aff., ¶ 5).  Plaintiff put up no resistance and was fully cooperative despite the fact that he believed that he had done nothing wrong.  (Pla. aff., ¶ 6).  Plaintiff suspected that the treatment was due to his race.  (Pla. aff., ¶ 6).

---

[1]Doc. No. 12

[2]Doc. No. 11

[3]Doc. No. 18

[4]Doc. No. 18

Plaintiff was placed in the back of a police car with Atkins that had a concealed digital recorder that recorded Plaintiff's conversation with Atkins. The recorded conversation showed that Plaintiff and Atkins were strangers and that Plaintiff was not aiding and abetting Atkins' attempt to flee the police. After reviewing the recording, Sotolongo determined that Plaintiff should be released. (Sotolongo aff., ¶ 4).

Sotolongo told Plaintiff that he had been detained in order to determine whether he had been aiding and abetting Atkins and that the police had determined that Plaintiff was not involved. (Sotolongo aff., ¶ 5). During the conversation between Plaintiff and Sotolongo, Plaintiff appeared to Sotolongo to be excited, agitated, and indignant about the fact that he had been detained by the police. (Sotolongo aff., ¶ 5). However, Sotolongo concedes that Plaintiff was never verbally threatening towards the police or any other citizens. (Doc. No. 18: Sotolongo's Employee Statement Form, p. 8).

Plaintiff characterizes his own demeanor as follows: "I was not exactly enthusiastic. But I was not enraged, out of control, noncooperative or otherwise any kind of threat to any of those officers." (Pla. aff., ¶ 13). Furthermore, Plaintiff states that at no point during the traffic stop did he raise his voice, threaten the police, or confront them in any way. (Pla. aff., ¶ 11).

Because Plaintiff did not immediately inform Eron that he had a gun in his car and because Sotolongo perceived Plaintiff as being in an agitated state, Sotolongo advised Plaintiff that he would not return the gun to him, and instead, Sotolongo advised Plaintiff that his gun, holster, and concealed weapons permit would be taken to the police station for safekeeping.[5]

---

[5]Prior to being seized by the police, the gun had nine bullets, including one in the chamber. (Yaslowitz aff., ¶ 6). Sotolongo has stated in his affidavit that his primary concern in not returning the gun to Plaintiff at the scene of the traffic stop was the safety of the officers that were there because Plaintiff seemed upset, agitated, and indignant towards the officers.

(Sotolongo aff., ¶ 7). Sotolongo directed Yaslowitz to take the gun to the police station.

(Sotolongo aff., ¶ 9). Sotolongo told Plaintiff that he could retrieve the items the next morning.

(Sotolongo aff., ¶ 7).

Sotolongo did not tell Plaintiff why he would not return his items to him, and Sotolongo

did not give Plaintiff a choice in the matter. (Pla. aff., ¶ 9). Even though he did not agree that

his items should be taken to the police station, Plaintiff did not protest Sotolongo's decision to

do so, because Plaintiff had been handcuffed and detained for approximately a half hour and he

felt that protesting would be futile and could lead to further police mistreatment. (Pla. aff., ¶ 9,

13). The next day, Plaintiff retrieved his gun, holster, and permit from the police station.[6] (Pla.

aff., ¶ 10).

Plaintiff filed the instant lawsuit, in which he asserts four claims: (1) a § 1983 claim for

seizure of his property in violation of the Fourth Amendment against Sotolongo and Yaslowitz

in their individual capacities[7]; (2) a § 1983 failure to train claim against the City; (3) an assault

--------

(Sotolongo aff., ¶ 11).

[6]At some point in time after this incident, Yaslowitz contacted the State in an attempt to get Plaintiff's concealed weapons permit revoked for failing to immediately notify Eron, without prompting, that he had a gun when he was stopped. (Yaslowitz aff., Ex A; Doc. No. 18: Yaslowitz's Employee Statement Form, p. 6).

[7]The Court notes that in his complaint, Plaintiff alleges that Sotolongo and Yaslowitz deprived him of his property without due process of the law. (Doc. No. 1, ¶ 66). While Plaintiff specifically identifies the Fourth Amendment as a constitutional right that was violated (Doc. No. 1, p. 1, 21), he does not specifically identify the Fourteenth Amendment as a constitutional right that was violated. As a result, Defendants Sotolongo and Yaslowitz move for dismissal or summary judgment regarding Plaintiff's Fourteenth Amendment procedural due process claim to the extent that one is alleged in the complaint. Such a claim is not clearly alleged in the complaint, and Plaintiff has not responded to their argument. As such, the Court construes Plaintiff's lack of a response as conceding that he has not adequately alleged a Fourteenth Amendment procedural due process claim. Therefore, the Court will dismiss that claim, to the extent that it is alleged in the complaint, without prejudice.

and battery claim against the City; and (4) a conversion/trespass claim against the City.  In

response, Defendants have moved to dismiss the claims or to be granted summary judgment on

the claims.  Accordingly, the Court will analyze each motion.

**III.  Defendants Sotolongo and Yaslowitz's Motion for Summary Judgment**

In Count I, Plaintiff asserts a Fourth Amendment claim against Defendants Sotolongo

and Yaslowitz (collectively referred to as "Officer Defendants") due to their taking Plaintiff's

property to the police station to be held overnight.  The Officer Defendants move for summary

judgment on this claim, arguing: (1) there was no Fourth Amendment violation, and (2) even if

there was a Fourth Amendment violation, they are entitled to qualified immunity.  As explained

below, the Court rejects these arguments and denies the Officer Defendants' motion for

summary judgment.

**A.  Fourth Amendment**

"A seizure of property . . . occurs when there is some meaningful interference with an

individual's possessory interests in that property."  Soldal v. Cook County, Illinois, 506 U.S. 56,

61 (1992)(quotation marks and citation omitted).  Furthermore:

> The fourth amendment prohibition of unreasonable searches and seizures means
> simply that, without proper consent, the government may neither seize nor search
> private property unless there is probable cause for the action. Probable cause
> alone, however, does not suffice. There must also be a warrant or exigent
> circumstances. There are exceptions to these general principles, but these
> exceptions are limited and carefully defined.

U.S. v. Williams, 617 F.2d 1063, 1095 (5th Cir. 1980)(Rubin, J., concurring)(quotation marks

and citation omitted).

"The exigent circumstances doctrine applies only when the inevitable delay incident to

obtaining a warrant must give way to an urgent need for immediate action." U.S. v. Davis, 313

F.3d 1300, 1302 (11th Cir. 2002)(quotation marks and citation omitted).  Accordingly:

> [T]he most urgent emergency situation excusing police compliance with the
> warrant requirement is, of course, the need to protect or preserve life.  The
> government bears the burden of proving that the exception applies and must
> establish both an exigency and probable cause.  In emergencies, probable cause
> exists where law enforcement officials reasonably believe that someone is in
> danger.

Id. (quotation marks and internal citations omitted).

In the instant case, the Officer Defendants argue that there was no Fourth Amendment

violation, because Plaintiff's gun was taken and held overnight due to concern for the safety of

the officers.  It is true that "the warrantless seizure of a gun is 'objectively reasonable' under the

Fourth Amendment when there is a real concern for the safety of the officers present or the

public at large." U.S. v. Newsome, 475 F.3d 1221, 1226 (11th Cir. 2007)(citing New York v.

Quarles, 467 U.S. 649, 653 n.3 (1984); U.S. v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989)).

However, after construing the facts in the light most favorable to Plaintiff, it was not objectively

reasonable for the Officer Defendants to retain the gun overnight, as there was not a real concern

for officer safety.[8]

The facts, construed in the light most favorable to Plaintiff, show that while Plaintiff may

have been agitated by being handcuffed and detained due to the officers' mistaken belief that he

was aiding and abetting Atkins, Plaintiff was not enraged, out of control, noncooperative, or

otherwise threatening to any of the officers.  At no point during the traffic stop did Plaintiff raise

his voice, threaten the police, or confront them in any way.  As such, it was unreasonable for the

---

[8]Furthermore, officer safety cannot be the justification for the overnight retention of
Plaintiff's holster and concealed weapons permit.

Officer Defendants to retain Plaintiff's gun, holster, and concealed weapons permit overnight,

because the facts, according to Plaintiff, show that their was no real threat to officer safety.

Accordingly, the Court finds that under considering the facts in the light most favorable to

Plaintiff, there was a violation of his Fourth Amendment rights.

Additionally, the Officer Defendants argue that Plaintiff consented to the taking of his

property. Plaintiff, however, responds that he did not consent. The Eleventh Circuit has stated:

> Whether an individual's consent . . . was given voluntarily is a question of fact
> that must be decided in light of the totality of the circumstances. Further, "'[t]he
> government bears the burden of proving ... that the consent was not a function of
> acquiescence to a claim of lawful authority but rather was given freely and
> voluntarily.'" . . . And while we have enumerated a number of (non-exclusive)
> factors that may bear on the issue of voluntariness, the absence of official
> coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here
> there is coercion, there cannot be consent."

U.S. v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996)(internal citations omitted). Furthermore,

failure to object does not equal consent, as the Eleventh Circuit is hesitant "to find implied

consent (i.e., consent by silence) in the Fourth Amendment context." Id. at 829-30 (citations

omitted).

Construing the facts in the light most favorable to Plaintiff, he did not consent to the

taking of his property, since Sotolongo did not give Plaintiff a choice in the matter.

Furthermore, Plaintiff's failure to protest the decision to keep his property overnight could, at

most, be construed as Plaintiff yielding to Sotolongo's authority, because: (1) Plaintiff was not

given a choice in the matter, and (2) Plaintiff was told of Sotolongo's decision after Plaintiff had

just been handcuffed and detained despite doing nothing illegal.[9] Accordingly, the Court rejects

---

[9]The Court is not faulting the police for detaining Plaintiff, as it is understandable that the
officers initially believed that Plaintiff had knowingly assisted Atkins based on Plaintiff giving
Atkins a ride when Atkins was fleeing from the police.

the Officer Defendants' argument that they should be granted summary judgment because there

was no Fourth Amendment violation.

### B.  Qualified Immunity

Next, the Officer Defendants argue that even if there was a Fourth Amendment violation,

they are entitled to qualified immunity.  "Qualified immunity offers complete protection for

government officials sued in their individual capacities if their conduct 'does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'"

Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(quoting Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982)).  "An officer will be entitled to qualified immunity if his actions were

objectively reasonable, that is if an objectively reasonable officer in the same situation could

have believed that" the seizure of Plaintiff's gun, holster, and concealed weapons permit

comported with applicable law.  Id. (citation omitted).

In determining whether the Officer Defendants are entitled to qualified immunity, the

Officer Defendants must prove that they were acting within the scope of their discretionary

authority.  See id. (citation omitted).  Plaintiff does not dispute that they were doing so.

Next, the burden shifts to Plaintiff to show that qualified immunity is not appropriate.

See id. (citation omitted).  "The Supreme Court has set forth a two-part test for the qualified

immunity analysis."  Id.  The first inquiry is whether, taking the facts in the light most favorable

to Plaintiff, the facts alleged show that the Officer Defendants violated a constitutional right.

See Saucier v. Katz, 533 U.S. 194, 201 (2001).  The Court has already answered this question in

the affirmative.

Since the Court has found that Plaintiff's allegations show that the Officer Defendants

violated the Fourth Amendment, the next step is to determine whether the right was clearly

established.  See id.  This determination "must be undertaken in light of the specific context of

the case, not as a broad general proposition."  Id.  In order for the right that was violated to have

been clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right.  The relevant, dispositive

inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  Id. (internal

quotation marks and citations omitted).  "This is not to say that an official action is protected by

qualified immunity unless the very action in question has previously been held unlawful, but it is

to say that in the light of pre-existing law the unlawfulness must be apparent."  Hope v. Pelzer,

536 U.S. 730, 739 (2002)(internal quotation marks and citations omitted).  As such, fair warning

exists if "'prior decisions gave reasonable warning that the conduct then at issue violated

constitutional rights.'"  Id. at 740 (quoting U.S. v. Lanier, 520 U.S. 259, 269 (1997)).

The Eleventh Circuit has set forth three ways that it can be shown that a right was clearly

established:

> First, the words of the pertinent federal statute or federal constitutional provision
> in some cases will be specific enough to establish clearly the law applicable to
> particular conduct and circumstances and to overcome qualified immunity, even
> in the *total absence of case law*.  This kind of case is one kind of "obvious
> clarity" case.
>
> *     *     *
>
> Second, if the conduct is not so egregious as to violate, for example, the Fourth
> Amendment on its face, we then *turn to case law*. When looking at case law,
> some broad statements of principle in case law are not tied to particularized facts
> and can clearly establish law applicable in the future to different sets of detailed
> facts. . . . These precedents are hard to distinguish from later cases because so few
> facts are material to the broad legal principle established in these precedents; thus,
> this is why factual differences are often immaterial to the later decisions. But for

judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

&ast;      &ast;      &ast;

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.* That is, we look for cases in which the Supreme Court or [the Eleventh Circuit], or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category.

&ast;      &ast;      &ast;

For the first and second type of notice or warning, [Hope v. Pelzer] instructs that "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."  Instead, in the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when the preexisting general constitutional rule applies "with obvious clarity to the specific conduct in question," and it must have been "obvious" to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time.

Vinyard, 311 F.3d at 1350-52 (internal citations omitted).

Accordingly, the issue for the Court to determine is whether the state of the law on October 6, 2005 gave the Officer Defendants fair warning that the retention of Plaintiff's property overnight was unconstitutional.  Hope, 536 U.S. at 741.  The Court holds that it did.

While Plaintiff has not submitted any case law with similar facts in order to show that the Officer Defendants had fair warning that their conduct was unconstitutional, that is not fatal to his claim.  Instead, as explained below, broad statements of principle in case law existed that made it obvious to a reasonable police officer in the Officer Defendants' position that the retention of Plaintiff's property overnight was unlawful.

It was clearly established on October 6, 2005 that the Fourth Amendment prohibits

seizures of property unless there is (1) proper consent, or (2) probable cause and either exigent

circumstances or a warrant. Williams, 617 F.2d at 1095 (5th Cir. 1980)(Rubin, J., concurring).

Furthermore, on October 6, 2005, it was clearly established that "[t]he exigent circumstances

doctrine applies only when the inevitable delay incident to obtaining a warrant must give way to

an urgent need for immediate action." U.S. v. Davis, 313 F.3d 1300, 1302 (11th Cir.

2002)(quotation marks and citation omitted); see also U.S. v. Satterfield, 743 F.2d 827, 844 (11th

Cir. 1984)(citation omitted).  Finally, it was clearly established on October 6, 2005 that

"[e]xigent circumstances exist when . . . police officers are faced with a situation where failure to

act immediately may jeopardize the safety of the officers and the public." U. S. v. Newbern, 731

F.2d 744, 749 (11th Cir. 1984).  These general principles gave the Officer Defendants fair

warning that the taking of Plaintiff's property overnight was unconstitutional.

As previously explained, during the traffic stop, Plaintiff was cooperative, he did not

raise his voice, he did not threaten or confront the officers, and he was not enraged.

Furthermore, when the Officer Defendants decided to keep Plaintiff's gun overnight, Plaintiff

was not suspected of being involved in any criminal activity.  As such, the Court finds that it

would be clear to a reasonable officer in the Officer Defendants' position that Plaintiff was not a

threat to officer safety, and therefore, taking his property overnight in order to ensure officer

safety would be unconstitutional.  Under the facts alleged by Plaintiff, the unlawfulness of the

Officer Defendants' conduct was apparent, as no reasonable officer could conclude that there

was an urgent need for immediate action such that the taking of his property would be lawful.

The Court notes that "'[b]ecause many situations which confront officers in the course of

executing their duties are more or less ambiguous, room must be allowed for some mistakes on

their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.'" See Illinois v. Rodriguez, 497 U.S. 177, 185 (1990)(quoting Brinegar v. U.S., 338 U.S. 160, 176 (1949)).  However, in the instant case, the Officer Defendants' conduct, under Plaintiff's version of the facts, was not reasonable.

Likewise, the Court finds that no reasonable officer in the Officer Defendants' position could conclude that Plaintiff consented to the taking of his property overnight, because Plaintiff was not given a choice in the matter.  It was clearly established by the Eleventh Circuit prior to October 6, 2005 that the failure to object, alone, cannot equal consent.  See Gonzalez, 71 F.3d at 829-30.

Furthermore, in Hudson v. Hall, 231 F.3d 1289, 1297 (11th Cir. 2000), two of the plaintiffs alleged that a police officer did not ask for or receive their consent before searching them, and the appellate court affirmed the denial of qualified immunity to the officer on the issue of the search of their persons based on lack of consent.  Similarly, in the instant case, Plaintiff alleges that the Officer Defendants did not ask for or receive his consent to retain his property overnight.

Based on the above, the Court finds that the Officer Defendants had fair warning that the retention of Plaintiff's property overnight was unconstitutional.  Accordingly, the Court finds that the Officer Defendants are not entitled to qualified immunity, and the Court denies their motion for summary judgment on Count I.

**IV.  Defendant City of St. Petersburg's Motion for Summary Judgment or Dismissal**

The City moves for summary judgment or dismissal of Plaintiff's § 1983 failure to train claim, assault and battery claim, and conversion/trespass claim.  Accordingly, the Court will

analyze each claim.

### A. § 1983 Failure to Train Claim

In Count II, Plaintiff asserts a § 1983 failure to train claim against the City. The City

moves for summary judgment on this claim, arguing that there is no evidence that the City was

on notice that there was inadequate training. As explained below, the Court agrees and grants

the City summary judgment on this claim.

The City can be held liable under § 1983 only where the City itself causes the

constitutional violation at issue. See City of Canton v. Harris, 489 U.S. 378, 385 (1989)(citation

omitted). "Respondeat superior or vicarious liability will not attach under § 1983." Id. (citation

omitted). Instead, it is only when the execution of the City's policy or custom inflicts the injury

that the City may be held liable under § 1983. See id. (citations omitted).

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the

basis for liability under § 1983." Id. at 387. As the Supreme Court explained in City of Canton

v. Harris:

> [T]he inadequacy of police training may serve as the basis for § 1983 liability
> only where the failure to train amounts to deliberate indifference to the rights of
> persons with whom the police come into contact. This rule is most consistent
> with our admonition . . . that a municipality can be liable under § 1983 only where
> its policies are the "moving force [behind] the constitutional violation." Only
> where a municipality's failure to train its employees in a relevant respect
> evidences a "deliberate indifference" to the rights of its inhabitants can such a
> shortcoming be properly thought of as a city "policy or custom" that is actionable
> under § 1983. . . "[M]unicipal liability under §1983 attaches where-and only
> where-a deliberate choice to follow a course of action is made from among
> various alternatives" by city policymakers. Only where a failure to train reflects a
> "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our
> prior cases-can a city be liable for such a failure under § 1983.
>
> Monell's rule that a city is not liable under § 1983 unless a municipal policy
> causes a constitutional deprivation will not be satisfied by merely alleging that the

existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.  That much may be true.  The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."  It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.  It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.

Id. at 388-91 (internal citations omitted).

Eight years later, the Supreme Court characterized Canton's leaving open the possibility

that a need to train could be so obvious that a city could be held liable under § 1983 without a

showing of a pattern of prior constitutional violations as follows:

In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law

15

enforcement officers with specific tools to handle recurring situations.  The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right.

Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 409 (1997).

In order to impose § 1983 liability on the City, Plaintiff "must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)(citation omitted).  While Plaintiff has shown that his Fourth Amendment constitutional rights were violated due to the seizure of his gun, holster, and permit overnight, he has not shown that the City had a custom or policy that constituted deliberate indifference to that constitutional right.

In order to establish deliberate indifference, Plaintiff must present some evidence that the City knew of a need to train in a particular area, but the City made a deliberate choice not to take any action and to disregard the known or obvious consequences of the failure to train in that particular area.  See Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)(citations omitted); see also Brown, 520 U.S. at 410.  The Eleventh Circuit has repeatedly "held that without notice of a need to train . . . in a particular area, a municipality is not liable as a matter of law for any failure to train."  Gold, 151 F.3d at 1351.  As such, Plaintiff must demonstrate that the City was deliberately indifferent by showing either: (1) that the City's policy or training

16

program was, on its face, clearly inadequate and likely to give rise to constitutional violations;[10] or (2), while not plainly deficient, the City's policy or training program has in the past so often led to violations of constitutional rights similar to those claimed by Plaintiff that the need for further training must have been plainly obvious to the City policy makers.  See Brown v. City of Elba, 754 F. Supp. 1551, 1557-58 (M.D. Ala. 1990).

Plaintiff has put forth no evidence that the City's policy or training program had in the past so often led to violations of constitutional rights similar to those claimed by Plaintiff that the need for further training must have been plainly obvious to the City policy makers.  Instead, Plaintiff relies on the theory that the City's policy or training program is, on its face, clearly inadequate and likely to give rise to constitutional violations.  However, the Court rejects this argument.  Instead, the Court finds that Plaintiff's contention that police officers were inadequately trained regarding seizures of property falls far short of the obvious need for training that would support a finding of deliberate indifference by the City.  The seizure of Plaintiff's property overnight was not so outrageous of an incident as to indicate a policy of indifference to or tolerance of constitutional violations.

Only in very limited circumstances will the need to train be so obvious without prior constitutional violations that a § 1983 failure to train claim will survive.  This Court finds that the present case does not represent one of those limited circumstances.  As such, the Court finds that the City is entitled to summary judgment on Plaintiff's § 1983 failure to train claim.

The Court notes that Plaintiff argues that a policy can be shown by the police department

---

[10]An example would be a failure to train officers in the constitutional limits on the use of deadly force.  See Gold, 151 F.3d at 1352.

ratifying the Officer Defendants' conduct.  In support of this argument, Plaintiff cites a non-

binding case, <u>Dixon v. Lowery</u>, 302 F.3d 857 (8th Cir. 2002).  The Court is not persuaded by the

<u>Dixon</u> case.

In <u>Dixon</u>, there was a property dispute of sorts between the plaintiff and Aaron Omar

regarding the Big Mamou establishment.  <u>See id.</u> at 860-61.  Omar hired police officers to work

at the Big Mamou and used them to aid him in keeping the plaintiff off of the property.  <u>See id.</u>

Thereafter, the plaintiff sued the city, arguing that it was liable under § 1983 because the police

chief allowed its officers to remain working as off-duty officers at the Big Mamou in the face of

the plaintiff's complaints that they were improperly depriving him of his property.  <u>See id.</u> at

860.  The district court in <u>Dixon</u> granted summary judgment in favor of the city, and the

appellate court remanded so that the district court could develop the record as to whether the city

could be held liable under § 1983, and consistent with precedent, for the failure to order the

officers to cease their off-duty employment sooner.  <u>See id.</u> at 867.

Plaintiff's reliance on <u>Dixon</u> is misplaced.  In <u>Dixon</u>, the plaintiff alleged that the city

was aware of a constitutional violation and failed to take corrective measures (<u>i.e.,</u> ordering the

officers to cease their off-duty employment) for a period of time.  However, in the instant case,

there is no evidence that the police department ratified the Officer Defendants' conduct.  Instead,

the police department investigated Plaintiff's claims regarding the seizure of Plaintiff's property

and found Plaintiff's allegations to be "not sustained," which means that the investigation failed

to disclose sufficient evidence to prove Plaintiff's allegations.  (Doc. No. 18: Nov. 20, 2006

letter to Plaintiff; Doc. No. 18: DeKay's Oct. 19, 2006 memo to all personnel).  As such, the

Court rejects Plaintiff's argument that the police department's response to his complaint is

evidence of their policy that similar seizures will be tolerated.  Accordingly, the Court grants

summary judgment on Count II.

### B.  Assault and Battery Claim

In Count III of his complaint, Plaintiff asserts an assault and battery claim against the

City and alleges that the City "is vicariously liable for negligent, unprivileged, unprovoked

injury caused by" Yaslowitz handcuffing him.  (Doc. No. 1, ¶ 83).  The City argues that this

claim must be dismissed for failure to state a claim, since there is no recognized *negligent*

assault and battery claim, because assault and battery are intentional torts.  See City of Miami v.

Sanders, 672 So. 2d 46 (Fla. 3d DCA 1996).  Plaintiff has not responded to this argument, and as

such, the Court presumes that he concedes that he has failed to state a claim in Count III.

Therefore, the motion to dismiss Count III is granted.

### C.  Conversion/Trespass Claim

In Count IV of the complaint, Plaintiff asserts a claim for the taking of his property

overnight, stating that the "claim sounds in both common law conversion and trespass, those

torts being essentially interchangeable in the present case."  (Doc. No. 1, ¶ 86).  The City argues

that this claim must be dismissed for failure to state a claim, because conversion is an

unauthorized act that deprives another of his property permanently or for an indefinite time, and

the police only kept his property overnight.  See Fogade v. ENB Revocable Trust, 263 F.3d

1274, 1291 (11th Cir. 2001)(citations omitted); In re Sarasota Plaza Associates Ltd. Partnership,

139 B.R. 259, 262 (M.D. Fla. Bankr. 1992)(citations omitted).  Plaintiff has not responded to this

argument, and as such, the Court presumes that he concedes that he has failed to state a claim for

conversion and trespass.  Accordingly, Plaintiff's conversion claim is dismissed with prejudice

and his trespass claim is dismissed without prejudice.

## V.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)      Defendants Sotolongo and Yaslowitz's Motion to Dismiss (Doc. No. 10) is

**GRANTED TO THE EXTENT THAT** the Court dismisses without prejudice

Plaintiff's Fourteenth Amendment procedural due process claim to the extent that

such a claim is asserted in the complaint;

(2)      Defendants Sotolongo and Yaslowitz's Motion for Summary Judgment (Doc. No.

10) is **DENIED TO THE EXTENT THAT** Plaintiff asserts a § 1983 claim for

seizure of his property in violation of the Fourth Amendment against them in their

individual capacities.

(3)      Defendant City of St. Petersburg's Motion to Dismiss (Doc.  No. 9) is

**GRANTED TO THE EXTENT THAT** the negligent assault and battery claim

in Count III and the conversion claim in Count IV are dismissed with prejudice,

and the trespass claim in Count IV is dismissed without prejudice.

(4)      Defendant City of St. Petersburg's Motion for Summary Judgment (Doc. No. 9) is

**GRANTED** as to Count II.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of June, 2007.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record